IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


CLYDE D. THOMAS                                              PLAINTIFF

            v.                    Civil No. 2:11-CV-02150

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                              DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Clyde D. Thomas, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claim for supplemental insurance benefits ("SSI") under Titles XVI of the Social Security Act, 42 U.S.C. §§ 423(3)(1)(A), 1382c(a)(3)(A) [hereinafter "the Act"].  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. §405(g).

I.      **Procedural Background**:

Plaintiff protectively filed his application for SSI on April 30, 2009, alleging the same as his disability onset date.  Tr. 11.  Plaintiff was thirty-eight years old at filing and alleged disability due to attention deficit/hyperactivity disorder ("ADHD"), intermittent explosive disorder, impulse control disorder, and personality disorder.[1]  *See* Pl.'s Br. 1.  The application was denied on August, 17, 2009, and denied after reconsideration on October 12, 2009.  Tr. 11. At Plaintiff's request, an

─────────────────────

[1] In his initial application, Plaintiff claimed disability was also attributable to "arthritis in his hands, feed, and back, back spasms, bronchitis, and the inability to get along with people at work."  Tr. 63.  However, Plaintiff does not specifically allege these impairments on appeal.  *See* Pl.'s Br. 1.  Nor did the ALJ find his alleged arthritis to be severe.  Tr. 13.

1

administrative hearing was held on February 25, 2010.  Tr. 24 -58.  Plaintiff testified at the hearing and was represented by attorney Fred Caddell.  *Id.*  Dale Thomas, a vocational expert, also testified. *Id.*  On July 8, 2011, the Appeals Council denied Plaintiff's request for review, thus the ALJ's decision became the final decision of the Commissioner.  Tr. 1-3.  Plaintiff filed this action on August 12, 2011, and is before the undersigned by consent of the parties. ECF No. 1, 5.  Both parties have filed appeal briefs, and the case is now ready for decision.  ECF No. 11, 12.

II.     **Medical History and Evidence Presented**:

    A.     Cornerstone Clinic

 Plaintiff was seen by his primary care physician, Robert W. Ross, M.D., on October 27, 2007.  Tr. 236.  Dr. Ross noted Plaintiff had recently been approved for Medicaid and was establishing care.  *Id.*  Plaintiff complained of pain and discomfort in his back and both knees.  *Id.* Dr. Ross noted Plaintiff had been run over twice and "injured his back and knees both times."  *Id.* The notes revealed that x-rays showed "crepitation[2], which [Dr. Ross thought] represents the development of arthritis."  *Id.*  Dr. Ross noted Plaintiff walked with a normal gait, had no pain when asked to do straight leg raises, and had full range of motion to "all of his joints."  *Id.*  To treat the pain, Dr. Ross prescribed decreasing monthly doses of Prednisone with Nabumetone.[3]  *Id.*

    On December 4, 2007, Dr. Ross's dictation revealed Plaintiff was being treated for "severe arthritis" for "several weeks" with pain in his back, hands, shoulders, and elbows.  Tr. 233.  Despite having "typical symptoms of osteoarthritis or rheumatoid arthritis, Dr. Ross indicated Plaintiff had

---

[2] Crepitation, or crepitus, refers to crackling and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together.  *Stedman's Medical Dictionary*, 368.

[3] Nambutone, brand name: Relafen, is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis.  U.S. NATIONAL LIBRARY OF MEDICINE, www.nlm.nih.gov/oyubmedhealth/PMH0000907/ (last visited Jun. 7, 2012).

"good grip strength and no motor or sensory loss." *Id.* Dr. Ross also noted Plaintiff's work required him to move "30-pound totes at OK Foods probably 200-300 times a day." *Id.* The notes also indicated Plaintiff had been involved in a motor vehicle accident ("MVA") "a couple weeks ago."[4] *Id.* To combat the pain, Dr. Ross prescribed Indocin[5] and had Plaintiff sign a pain management contract for twice-daily Hydrocodone to replace the Nambutone previously prescribed *Id.* To rule out suspected rheumatoid arthritis, Dr. Ross tested Plaintiff's blood to determine his rheumatoid factor.[6] Tr. 242. The results were "6", which fell in range, meaning there was no abnormality in the blood work to indicate the presence of rheumatoid factor. *Id.*

Plaintiff was seen February 25, 2008, complaining of coughing, chest congestion and needed "refills." Tr. 231-232. Plaintiff was diagnosed with acute bronchitis and osteoarthritis; he was given Clyndomyacin for the bronchitis and Lorcet and Indocin for the pain. Tr. 231-232. The unsigned physician report indicated Plaintiff had a decrease in range of motion in his back and "both knees" with "crepitation" noted in the margin. Tr. 232. Plaintiff was seen on September 8, 2008, for "refills" and a sore throat. Tr. 184-185. He was prescribed Indocin and Hydrocodone. Tr. 184. Examination showed Plaintiff had decreased range of motion in his back with tenderness noted. *Id.* No examination of his extremities is noted. *Id.*

---

[4] MVA was on November 27, 2007. Tr. 295.

[5] Indocin is used to relieve moderate to severe pain, tenderness, swelling and stiffness caused by osteoarthritis, arthritis, and ankylosing spondylitis (arthritis that mainly affects the spine). Common side effects of note include swelling, difficulty breathing, fast heartbeat, and back pain. U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedheahtl/PMH0000524/ (last visited Jun. 20, 2012).

[6] "Rheumatoid factors are a variety of antibodies that are present in 70-90% of people with rheumatoid arthritis (RA)...In general, when no rheumatoid factor is present in someone with RA, the course of the disease is less severe." *Blood Tests to Diagnose Arthritis,* WEBMD, http://www.webmd.com/rheumatoid-arthritis/guide/blood-tests (last visited Jun. 7, 2012).

Plaintiff was treated April 2, 2009, for "refills," shortness of breath, and bronchitis.  Tr. 182-183.  He was prescribed Indocin, Hydrocodone, Albuteral, and Clyndomyacin for bronchitis.  Tr. 183.  In the notes appeared a diagnosis of "cervical disc disease,"[7] however, absent are any exam notes in reviewing Plaintiff's back or extremities.  *Id.*  On November 6, 2009, Plaintiff presented for treatment of coughing at night with sleep disruptions and requested refills on his "reg. arthritis meds."  Tr. 228.  Plaintiff was diagnosed with "[b]ronchitis, depression and lumbar disc" and was given Hydrocodene refills (but no Indocin), Albuterol ProAir, and Celexa[8] for treatment.  Tr. 229.  Examination noted decreased range of motion in his back with tenderness in the dorsal lumber.  *Id.*  No examination of the extremities is noted.  *Id.*

B.    Sparks Regional Medical Center

On June 29, 2001, Plaintiff was treated in the ER for a right ankle sprain that happened while "playing basketball."  Tr. 351, 360.  He was given crutches, an aircast, and Lortab for the pain.  Tr. 351.  On February 23, 2007, Plaintiff was seen in the ER complaining of right knee pain after falling while playing basketball.  Tr. 295, 297.  He was diagnosed with a knee sprain and given crutches and a knee immobilizer.  Tr. 296.  On November 27, 2007, Plaintiff was treated in the ER  for a "motorcycle collision" complaining of dental and head pain after "knocking a few teeth out."  Tr. 285, 286, 289.  A computerized topography ("CT") scan was negative for brain injury.  Tr. 289.

---

[7] Cervical/Lumbar disc disease is a degeneration of the discs particularly in the moving sections of the spine [and] is a natural process of aging.  In most patients the mere presence of degenerative discs is not a problem leading to pain, neurological compression or other symptoms. Diagnosis can be through "plain x-ray", CT scan, or through MRI.  Treatment can include use of a cervical spine, facet joint injections under the care of a pain management specialist, or intradiscal electrothermal annuloplasty, or ultimately through spinal fusion.  *Conditions/Diagnoses: Degenerative Disc Disease*, UCLA SPINE CENTER, http://spinecenter.ucla.edu (last visited Jun. 7, 2012).

[8] Celexa, or Citalopram, is used to treat depression.  Common side effects of note are shortness of breath, confusion, stiff or twitching muscles, swelling, problems with thinking, concentration, or memory.  U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited Jun. 20, 2012).

C.     Van Hoang, M.D.

On July 16, 2009, Plaintiff saw Van Hoang, M.D., for a consultative physical. Tr. 187-191. Plaintiff reported frequent muscle spasms in his back, hands, feet, bronchial asthma since childhood and behavioral disorder. Tr. 187. Dr. Hoang noted Plaintiff had no arthritis and no bronchitis. *Id.* Plaintiff listed Pro Air HFA[9] and Lorcet 10/650 as his only medications. *Id.* Plaintiff had no surgical history noted. *Id.* Dr. Hoang determiend Plaintiff's range of motion on both sides of the body and the spine were all within normal ranges. Tr. 189. Dr. Hoang also noted the absence of swelling and/or tenderness on either side of the body and the absence of muscle spasms. Tr. 189-190. On examination, Dr. Hoang noted Plaintiff had no issues in performing straight-leg raises, and Plaintiff had no neurological reflex deficiencies, muscle weakness, muscle atrophy, sensory abnormalities, and no problems with his gait/coordination. Tr. 190. Plaintiff was able to hold a pen and write, touch his fingertips to palms, oppose thumb to fingers, pick up a coin, stand/walk without assistive devices, walk on his heel and toes, squat and arise from squatting position, and Plaintiff's grip was 100% normal in his right and left hand. *Id.* Dr. Hoang recorded Plaintiff was oriented to time, person and place. *Id.* Dr. Hoang diagnosed Plaintiff with: (1) frequent muscle spasm by history; (2) behavioral disorder by history; and, (3) bronchial asthma by history. *Id.* Dr. Hoang concluded Plaintiff had mild physical and mental limitations for work. *Id.*

D.     Kathleen M. Kralik, Ph.D.

On July 29, 2009, Plaintiff was seen by Kathleen M. Kralik, Ph.D. for a mental diagnostic evaluation. Tr. 193-200. Plaintiff had missed an earlier appointment. Tr. 226. Dr. Kralik noted

---

[9] Pro Air HFA is an albuterol sulfate rescue inhaler used to treat asthma, exercised induced bronchitis, and chronic obstructive pulmonary disorder. PROAIR HFA.COM, www.proairhfa.com (last visited Jun. 11, 2012).

Plaintiff was "quite vague" about his mental symptoms  as he listed  he "[d]on't no (sic).  Can't be around a lot of people - make (sic) me nervous." Tr. 193.   Plaintiff was unable to describe how he felt in social situations, but alleged he has occasional panic attacks, thinks others talk about him, perceives bosses pick on him, and feels like others are intruding into his space.  *Id.*

Dr. Kralik noted Plaintiff was separated from his wife/long-term partner and was living with his mother.  *Id.*   At the exam date, Plaintiff had been married for eighteen months, but had been with his wife for more than six years.  Tr. 194.  Plaintiff has five living children[10] of which only his ten-year-old twins reside with him, reportedly cared for by Plaintiff's mother.  Tr. 193.  Dr. Kralik noted Plaintiff sees his other minor children "once every three months or so" and is behind on his child support obligations.  *Id.*  Dr. Kralik found Plaintiff "seemed devoid of attachment...to any of his children."  Tr. 196.

Plaintiff indicated to Dr. Kralik he has violent tendencies and has "always been like this (i.e., immature, socially avoidant, easily irritated, parasitic-dependent, and somewhat misanthropic)".  Tr. 194.  Plaintiff had been arrested ten times, mostly for battery, but also for failure to pay child support.  *Id.*  Plaintiff recalled that nearly half of his arrests were substance related.  Tr. 195. Plaintiff was also ordered to two twenty-six week sessions of anger management in Fort Smith, which he completed in 2006 and late 2008.  Tr. 35, 47-48.  Despite this awareness of his social impairments, Plaintiff has never tried psychotropics[11] for any of his conditions.  Tr. 194.  Dr. Kralik

---

[10] Plaintiff reportedly has six minor children, but lost an infant son in 2004 to sudden infant death syndrome ("SIDS").  Tr. 194.

[11] Psychotropic medication is defined as any medication capable of affecting the mind, emotions, and behavior.  It can be used to treat personality disorders, but it best carried out in carefully designed clinical trials.  *The Use of Medication to Treat People with Antisocial Personality Disorder,* U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014563/ (last visited Jun. 21, 2012).

indicated she gave Plaintiff information on local indigent clinics and the benefits of psychotropics in managing pain while treating the anxiety but avoiding addiction.  *Id.*

Discussing his job history, Plaintiff denied any employer complaints related to his performance, indicated he missed some for work, and stated the longest he had been consistently employed was "about 4-5 months."  Tr. 195.  He indicated he had previously worked in factories, but that he chose to walk-off after "a week at most" due to "too many people around [him]."  *Id.*  Dr. Kralik determined that "he gets jobs, does not hold on to them, and allows others to support him; with no evident or reported sense of reciprocity that he should do anything for them in return."  Tr. 194.  While unemployed, Plaintiff played video games, watched television and used alcohol and marijuana.  *Id.*  Dr. Kralik noted Plaintiff has never attempted to obtain employment that would limit his social interactions.  *Id.*  Plaintiff's last employment was with McDonald's Wal-Mart Super Center location in 2008, lasting a "few weeks."  Tr. 195.

Plaintiff informed Dr. Kralik he smokes one pack of cigarettes daily, drinks a "few beers" but denies an alcohol problem, uses marijuana intermittently, and denies methamphetamine use.  Tr. 195.  Dr. Kralik dictated Plaintiff used Lorcet for "the last two years," but he could not remember who prescribed it, which Dr. Kralik noted as "somewhat suspicious."  *Id.*

Dr. Kralik noted there were "no significant pain behaviors" evident beyond "mild stiffness on rising."  Tr. 195.  She further noted Plaintiff did not report any pain issues as contributing to his unemployment status.  *Id.*  Dr. Kralik concluded Plaintiff had a lack of investment in his mental status performance exam and interview and found he was "fairly vague and not wholly credible" in regard to his alleged anxiety and panic symptoms.  *Id.*

7

During the formal mental status examination, Dr. Kralik found that his estimated IQ was "within or near the borderline range of functioning," i.e., higher than 75. Tr. 197. She further estimated that his current Global Assessment of Functioning ("GAF")[12] fell in the 35-45 range, but that within the past year if could have reached as high as 45-55. Tr. 198. Dr. Kralik concluded Plaintiff had the following mental impairments: (1) impulse control disorder not otherwise specified ("NOS"), combined intermittent explosive disorder and ADHD; (2) alcohol abuse; (3) cannabis abuse; (4) rule out Lorcet abuse and rule out pain disorder as a medical condition vs. malingering; (5) personality disorder NOS, antisocial/parasitic-dependent and narcissistic personality features; and (6) rule out borderline intellectual functioning. Tr. 198. Dr. Kralik concluded it was "difficult getting [Plaintiff] to clearly articulate symptoms suggestive of a disabling condition" and noted "[m]alingering/exaggeration cannot be definitely ruled out" as the "lack of a trial of psychotropics to better manage these alleged [pain] 'problems' would be of concern in making a determination of 'permanent disability'." Tr. 199. She further noted that if Plaintiff failed to seek treatment, the "reason should be probed" and suggested that "maintenance of the 'symptoms' [might be] the goal." Tr. 200. Dr. Kralik scheduled a follow-up appointment with Plaintiff for January 20, 2010, but Plaintiff was a no-show. Tr. 226.

---

[12] "The GAF score is a subjective determination that represents 'the clinician's judgement of the individual's overall level of functioning.'" *Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010) (citing *Wesley v. Comm'r of Soc. Sec.,* No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000) (quoting *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. 1994)). "According to the [DSM's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning...[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score..." *Jones,* 619 F.3d at 974 (citng *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 511 (6th Cir. 2006)).

E.    Winston Brown, M.D.

In an August 17, 2009, request for medical advice review, Winston Brown, M.D., a non-examining agency consultant, determined Plaintiff could perform work where interpersonal contact is incidental to work as Plaintiff had no marked limitations in understanding and memory, sustained concentration and persistence, social interaction, or adaption.  Tr. 201-220.  Dr. Brown found Plaintiff only had moderate limitations in: (1) concentrating for an extended period; (2) performing activities within a schedule, maintaining attendance, and punctuality; (3) making simple work-related activities; (4) completing normal work-day/week without interruptions and performing at a consistent pace without rest; (5) accepting instructions and responding appropriately to criticism, adapting to changes in the work place; and (7) setting realistic goals or making independent plans. Tr. 205.  As such, Dr. Brown recommended Plaintiff work as unskilled labor, where the complexity of tasks is learned and performed by rote with few variables requiring little judgment, and where the supervision is simple, direct and concrete.  *Id.*

Further, Dr. Brown concluded Plaintiff should have an RFC assessment taking into account 12.02 organic mental disorders, 12.08 personality disorders, 12.09 substance addiction disorders, and ADHD, as a disorder that does not specifically meet the listing requirements.  Tr. 207-208.  Dr. Brown found that the functional limitations were mild to moderate with no periods of decompensation.  Tr. 217.

On September 29, 2009, Martha Dull, M.D., a non-examining agency consultant, on reconsideration, affirmed Dr. Brown's finding that Plaintiff should have an RFC to reflect unskilled work as he alleged no worsening or new problems.  Tr. 221-225.

9

III.     **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id.*  "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider the evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year, and must establish that the disability prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 247 F.3d 1211, 1217 (8thCir. 2001); *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or medically equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhardt*, 390 F.3d 584, 590-591 (8th Cir. 2004).

**IV.    <u>ALJ's Determination</u>:**

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since April 30, 2009. Tr. 13. At step two, the ALJ found Plaintiff had the following severe impairments: (1) ADHD; (2) intermittent explosive disorder; (3) impulse control disorder; (4) personality disorder; and (5) alcohol and cannabis abuse. *Id.* Further, the ALJ found Plaintiff's diagnosis of crepitus, interpreted as the development of arthritis, was not confirmed by any objective medical tests. *Id.* Without more, the ALJ found the arthritis was not severe. *Id.* The ALJ also found that Plaintiff's recurrent bronchitis was well-controlled with his Albuterol inhaler, and therefore was not severe. Tr. 14. Finally, the ALJ noted that substantial weight was given to Dr. Van Hoang, who performed a consultative physical and assigned Plaintiff a mild physical limitation

11

for work.  *Id.*

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments under 12.02 or 12.08 of the Act.  Tr. 14.  Assessing Paragraph B and C factors, the ALJ determined Plaintiff's daily living was mildly restricted, noting that Plaintiff is able to perform a few chores, mow the lawn, watch television and play video games, and noted the record showed Plaintiff sought medical treatment for at least two injuries while playing basketball.  *Id.*  The ALJ found Plaintiff had moderate difficulties in social functioning as he has a long history of fighting with co-workers/supervisors, was currently separated from his wife and other three children, and spent most of his time in his mother's home. *Id.*  The ALJ relied on Dr. Kathleen Kralik's mental diagnostic evaluation to find Plaintiff had moderate difficulties in concentration, persistence, or pace "primarily due to [his] low investment and/or inattentiveness."  *Id.*  Finally, the ALJ concluded that there was no allegation or evidence in the record of any episodes of decompensation so neither Paragraph B or C criteria were met.  Tr. 15.

Accordingly, at step four, the ALJ found Plaintiff was able to perform a full range of work at all exertional levels but with the following nonexertional limitations: (1) incidental interpersonal contact; (2) rote tasks where learning and performance require little judgment and few variables; (3) simple, direct and concrete supervision; and (4) no contact with the general public.  *Id.*  Giving substantial weight to Dr. Kralik's mental evaluation, the ALJ concluded Plaintiff's statements about the intensity, persistence and limiting effects on his mental symptoms were not credible; he noted Dr. Kralik expressed doubt that despite Plaintiff's "extensive history of violent crimes [and] current use of alcohol and marijuana" he had never been prescribed psychotropic medications.  Tr. 16. When Dr. Kralik offered to continue treatment with Plaintiff, he never showed for a follow-up

appointment.  Tr. 18.  Further, the consultative physicians who examined Plaintiff's records "found that [he] was not significantly limited in the ability to understand, remember and carry out very short, simple instructions."  *Id*.  The ALJ noted Plaintiff had no past relevant work.  Tr. 18.  At step five, the ALJ found there were jobs available in significant numbers in the national economy that Plaintiff could perform.  *Id*.  The ALJ heard testimony from a vocational expert who testified there were available jobs in the unskilled market Plaintiff could perform.[13]  *Id.*  Citing to section 204.00 of the Medical-Vocational Guidelines, the ALJ found nothing in the record to prevent Plaintiff from performing heavy work.  *Id*.  The ALJ determined Plaintiff was not under disability from April 30, 2009, date of onset, through August 26, 2010, the date of decision.  Tr. 19.

**V.**     **Discussion:**

On appeal, Plaintiff contends that the ALJ erred: (A) by finding Plaintiff failed to establish the alleged physical impairments as severe; and (B) improperly determined Plaintiff's mental and physical impairments in his RFC.  *See* Pl.'s Br. 9-16.  For the following reasons, the undersigned finds that substantial evidence supports the ALJ's decision.

**A.**     No Severe Physical Impairments**:**

Substantial evidence supports the ALJ's determination that Plaintiff's alleged arthritis in his hands and back were non-severe.  Step two of the regulations involves a determination, based on the medical evidence, whether the claimant has an impairment or combination or impairments that is severe.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A severe impairment significantly limits a claimant's physical or mental ability to perform basic work activities.   20 C.F.R. §

---

[13] The VE testified Plaintiff qualified as: (1) production worker/bench assembler (DOT 706.684-042) with 300,000 jobs nationally and 6,300 statewide; (2) maid/house cleaner (DOT 382.685-010) with 280,000 jobs nationally and 2,500 statewide, and (3) eviscerator (DOT 525.687-074) with 44,000 nationally and 5,000 statewide.

404.1520(c).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Bowen v. Yucket*, 482 U.S. 137, 153) (1987) (O'Connor, J., concurring)).  The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have "no more than a minimal impact on her ability to work."  *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (citing *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)).  Although a claimant has the burden of establishing the severe impairment(s), the burden is not great.  *Caviness*, 250 F.3d at 605.

The objective medical evidence does not suggest Plaintiff's pain in his hands, back, shoulders or feet significantly limit his work abilities.  *Smith v. Shalala*, 987 F.2d 1371, 1374 (8thCir. 1993) (citing *Matthews v. Bowen*, 879 F.3d 422, 425 (8th Cir. 1989)).  First, Dr. Ross did not employ diagnostic examination or testing to confirm his suspicion of the presence of arthritis, instead providing Plaintiff with a rolling refill of narcotic pain medication.  *See Gowell v. Apfel*, 242 F.3d 793, 796 (8thCir. 2001) (conservative treatment with unremarkable diagnostic tests allow the ALJ to discredit claimant's claim of disabling pain).  X-ray imaging of Plaintiff's  T-spine showed the absence of fractures and exudates and the rheumatoid factor was negative for the presence of arthritis.  Tr. 233, 236, 242. Dr. Ross opined the presence of crepitation might "represent the development of arthritis" but he ordered no further diagnostic imaging to confirm.  Tr. 236.  *See Yates v. Astrue*, 347 Fed.Appx. 269, 270-271 (8th Cir. 2009) (ALJ properly credited consulting physician's assessment when the treating doctor's notes do not indicate extensive physical examinations and claimant's limitations are not supported by the record); *See also Gaudet v. Barnhart*, 248 F.Supp.2d 842, 848, 854 (8th Cir. 2003) (medical evidence to support claimant's

14

allegation of pain when: (1) treating physician noted scar tissue ten years prior to ALJ hearing; (2) several MRIs confirmed presence of degenerative changes in claimant's back; (3) claimant underwent three back surgeries and a procedure on her knee to treat the source of pain, including insertion of multiple nerve blocks and epidural steroid injections; and (4) doctor saw claimant regularly for clinical examination  and noted continual sciatic irritation on physical exam).  In contrast, Dr. Ross noted Plaintiff could walk with a normal gait and had a "full range of motion to all of his joints," but prescribed twice-daily narcotic medication to ease Plaintiff's pain.  Tr. 236. Despite the lack of objective medical evidence, Dr. Ross refilled Plaintiff's "arthritis medication" on four separate occasions from 2008 - 2010: (1) 2/25/08; (2) 9/8/08; (3) 4/2/09; and (4) 11/6/2009. Tr. 179-185, 227-229, 231-232; *See Matthews*, 879 F.2d at 425 (medical records showing only minimal back problem allowed ALJ to discount claimant's subjective complaints of disabling back pain).  Further, none of Dr. Ross's exam notes indicate any examination of Plaintiff's hands, his chief complaint of arthritis.  *Id.*  In fact, Dr. Ross diagnosed Plaintiff with "cervical arthritis"[14] and "lumbar disc" but made no mention of arthritis in Plaintiff's hands.  Tr. 185, 228-229.  In addition, the last record provided by Dr. Ross's office indicates Dr. Ross changed Plaintiff's treatment from Indocin to Celexa.  Tr. 228-229.  Plaintiff testified that this change in medication "helped [him] relax" and, incidentally, coincided with his cessation of marijuana usage.  Tr. 36, 43.

Second, Plaintiff only sought conservative treatment for his pain.  *See Thomas v. Barnhart*, 130 Fed. Appx. 62, 63-64 (8th Cir. 2005) (conservative treatment was inconsistent with claimant's allegations of disabling pain).  Since 2007, the record is void of any additional diagnostic testing by

---

[14] Cervical arthritis is a "general term for age-related wear and tear affecting the spinal disks in your neck." MAYOCLINIC.COM, www.mayoclinic.com/health/cervical-spondylosis/DS00697 (last visited Jun. 21, 2012).

Dr. Ross, and no other treatment option, such as physical therapy, was considered. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8thCir. 2007) (absence of formal treatment over long-term basis weighs against the presumption of alleged disability). Plaintiff even testified he was able to continue playing video games on his Wii, mow his mother's lawn occasionally, interact with his minor children at parks, and engage in at least ten physical confrontations, despite his assertion that his hands' cramping is "intolerable." Tr. 40, 43, 45. At least twice in 2007- the year Plaintiff alleges as arthritis onset - Plaintiff was treated at Sparks Hospital, once for basketball injuries and the other related to a motorcycle crash. Tr. 351, 285-289, 295, 297. Therefore, Dr. Ross's diagnosis and prescription of narcotic medication alone and/or together do not constitute a disability. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1037-1038 (8thCir. 2001) (physician's arthritis diagnosis was in contrast with the medical record as a whole, and the ALJ properly discredited complaints of pain when the claimant's testimony showed her daily activities were inconsistent with disabling level of pain alleged).

Third, neither consultative exam supported Plaintiff's alleged arthritis pain. *See Prosch*, 201 F.3d at 1014; 20 C.F.R. § 404.1527(d)(2). Dr. Hoang noted the absence of arthritis, edema, muscle weakness and stated Plaintiff maintained full range of motion on the both sides of his body, including 100% grip in both hands. Tr. 189, 247, 261. Further, Dr. Hoang concluded Plaintiff had only mild physical and mental limitations for work, and it was attributed solely to Plaintiff's self-reported medical history. Tr. 190. Additionally, Dr. Kralik noted Plaintiff did not exhibit pain behaviors during the exam and Plaintiff never attributed his pain to his inability to retain employment; she cautioned Plaintiff's failure to exhaust further treatment options would be "of concern in making a determination of 'permanent disability.'" Tr. 199. *See Shannon v . Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (citing *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (failure

16

to seek treatment may be inconsistent with a finding of disability)).  Because the medical evidence as a whole failed to establish Plaintiff suffered from arthritis as opined by Dr. Ross, the ALJ properly concluded Plaintiff's pain did not rise to the level of disabling pain required by the Act.  *See Kelly v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (treating physician's opinion is generally entitled to substantial weight, but it is not conclusive and must be supported by medically acceptable clinical or diagnostic data)).

Finally, the undersigned notes although the ALJ did not find Plaintiff's hand and back pain to be severe, he nevertheless took these impairments into consideration when determining Plaintiff's RFC.  Tr. 13.  *See* 20 C.F.R. § 404.1545(a)(2) (ALJ will consider both severe and non-severe impairments in determining a claimant's residual functional capacity).  For these reasons, the undersigned finds that substantial evidence supports the ALJ's non-severity determination.

    B.   <u>RFC Determination</u>:

A disability claimant has the burden of establishing his RFC.  *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhardt*, 363 F.l3d 731, 737 (8th Cir. 2004). A claimant's RFC is most he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).  Even though the RFC assessment draws from medical sources for support, it is ultimately

an administrative determination reserved to the Commissioner. 20 C.F.R. §§ 416.927(e)(2), 416.949 (2006).

    1.   <u>Physical Impairment</u>:

    Plaintiff contends the ALJ erred by not including Plaintiff's arthritis in his hands, feet and back when determining his RFC. *See* Pl.'s Br. 11-12. For the following reasons, the undersigned concludes that substantial evidence supports the ALJ's RFC determination. *Roberts v. Apfel*, 222 F.3d 466, 469 (8thCir. 2000) (ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence).

    A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in a claimant's record. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2). The record must evaluated as a whole to determine whether the treating physician's opinion should be controlling. *Reed v. Barnhart*, 399 F.3d 917, 90 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21 (quoting *Prosh v. Apfel*, 201 F.3d 1010,1013 (8th Cir. 2000)). In any case, an ALJ must always "give good reason" for the weight afforded to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

    The ALJ gave specific reasons for the weight afforded to Dr. Ross's opinion. First, the record shows Dr. Ross only saw Plaintiff on six occasions from 2007 - 2010: 10/27/07, 12/4/07, 9/8/08, 4/2/09, and 11/6/09. Tr. 179-185, 227-245. During this time, Dr. Ross sent Plaintiff for x-rays once and a single laboratory test to determine if Plaintiff had arthritis, which both denied. Tr.

236, 242.  Despite the lack of objective medical testing, Dr. Ross interpreted the presence crepitus

as signaling arthritis and began to prescribe narcotic medication to treat Plaintiff's pain.  Tr. 233,

236; *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions militates

against a finding of total disability).  Plaintiff testified he saw Dr. Ross only to obtain refills of his

narcotics.  Tr. 51; *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (Plaintiff's reliance on

conservative treatment only supports the ALJ's finding of non-disability).   Second, both Dr. Hoang

and Dr. Ross indicated Plaintiff had full range of motion, normal gait, could perform straight leg

raises without remark,  and he had "good" or "100%" grip.  Tr. 189-190, 236.  Notably, Dr. Hoang

did not find any indication Plaintiff suffered from arthritis; noted the absence of edema, muscle

spasms/atrophy or weakness, and tenderness.  Tr.187-190; *Reed*, 399 F.3d at 920-21.  Third, when

Dr. Kralik evaluated him, Plaintiff did not attribute his alleged disability to pain nor did he exhibit

any pain behavior tendencies.  Tr. 195, 197.  Further, Plaintiff refused to follow-up with Dr. Kralik's

suggestion he try an alternate treatment course; this failure, she suggested, could be construed as

malingering and/or attributed to Plaintiff's goals of symptom maintenance solely.  Tr. 199-200; *See*

*Brown v. Barnhart*, 390 F.3d 535, 540-541 (8th Cir. 2004) (failure to seek treatment or follow a

prescribed course of remedial treatment without good reason is inconsistent with allegations of

disabling pain); *But see Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (claimant properly availed

himself of many pain treatments: two back surgery, monthly visits with neurologist, twice weekly

chiropractic care, "countless" nerve blocks, and several MRIs to show changes in his back)).

Moreover, Dr. Kralik informed Plaintiff of an indigenous clinic that could help him achieve this level

of treatment; Plaintiff also had access to affordable medical care through his Medicaid coverage, but

he chose to not seek additional treatment.  Tr. 199-200, 226, 236; *See Branson v. Astrue*, 678 F.

Supp. 2d 947, 959 (E.D. Mo. 2010) (failure to seek medical treatment based on limited resources is not excusable when Plaintiff has access to medical care).

Because the medical evidence as a whole failed to establish Plaintiff suffered from arthritis, the ALJ properly accorded less weight to Dr. Ross's unsupported opinion. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (ALJ can accord the treating physician's opinion less weight when it is inconsistent with or contrary to the medical evidence as a whole)). Therefore, the ALJ's reliance on Dr. Hoang's assessment taken with the other medical evidence of record is proper. Accordingly, the undersigned concludes substantial evidence supports the ALJ's RFC determination.

2. <u>Mental Impairment</u>:

Plaintiff argues the ALJ erred when he failed to take into account Dr. Kralik's GAF score of 35-45 when assessing his RFC. *See* Pl.'s Br. 9-11. For the following reasons, the undersigned concludes the ALJ properly considered and weighed Plaintiff's GAF score against the medical evidence as a whole. *Jones v. Astrue*, 619 F.3d 963, 972-974 (8th Cir. 2010) (ALJ may afford greater weight to medical evidence and testimony than to a GAF score when the evidence requires it) (citing *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003) (ALJ agreed the GAF ratings did not appear to reflect claimant's current abilities based on claimant's own testimony during the hearings)).

It is assumed[15] Plaintiff is relying on the reasoning of *Pates-Fire v. Astrue* and *Brueggeman v. Barnhart*, in concluding that a GAF score below 50 indicates Plaintiff is unable to work and

---

[15]  Plaintiff cites no case law in arguing that the ALJ failed to account for Dr. Kralik's GAF score assessment, but indicates the score implies "serious symptoms." *See* Pl.'s Br. 9.

therefore disabled. *Pates-Fires*, 564 F.3d 935, 944 (8th Cir. 2009); *Brueggeman*, 348 F.3d 689, 695 (8th Cir. 2003). However, the court has never held that a GAF score is per se disabling. *Mortensen v. Astrue*, 2011 WL 7478305, *10 (Sept. 30, 2011). Furthermore, since the decision in *Pates-Fires,* the Eighth Circuit has "repeatedly upheld decisions to deny benefits for claimants with GAF scores below 50." *Mortensen*, 2011 WL 7478305, *10 (citing *Martise v. Astrue*, 641 F.3d 909, 919 (8th Cir. 2011) (GAF scores in the 40s and 50s); *Partee v. Astrue*, 638 F.3d 860, 862-63 (8th Cir. 2011) (GAF scores in the the 30s); *Hurd v. Astrue*, 621 F.3d 734, 736 (8th Cir. 2011) (GAF scores of 30, 40, 75); *Jones*, 619 F.3d at 973 (GAF scores in the mid-40s and low 50s)). Also, the Eighth Circuit has held that an ALJ may assign less weight to the scores if they are inconsistent with the medical record as a whole. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). Even the Social Security Administration cautioned that "[t]he GAF scale...does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed. Reg. 50746, 50764-765 (Aug. 21, 2000).

Unlike the *Pates-Fire* claimant, Plaintiff's GAF score has only been measured once. *Pates-Fire*, 564 F.3d at 944 (claimant's GAF was tested twenty-one times in a six year period). Dr. Kralik assessed Plaintiff and assigned him a GAF of 35-45, with the highest estimated GAF within the past year at 45-55. Tr. 198. The ALJ gave Dr. Kralik substantial weight, but only gave "little weight" to her assessment of Plaintiff's GAF score stating it is not a "reliable measure" as it "reveal[s] only a picture in time [that is] very subjective with the examiner." Tr. 17. Specifically, the ALJ found the intensity, persistence and limiting effects of Plaintiff's mental symptoms were not credible. Tr. 16. Even Dr. Kralik noted "[m]alingering/exaggeration cannot be definitely ruled out; i.e., there was some suggestion that he was acting more somber and less able to understand and control his dysregulation issues than evidence might suggest otherwise." Tr. 199; *See Jones*, 619 F.3d at 972

21

(citing *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) (treating mental health professional's question about claimant's sincerity entitled ALJ to draw conclusions about claimant's credibility)). Dr. Kralik also noted Plaintiff's reasons for not seeking/maintaining employment are more attributable to his "personal preferences, immaturity, and parasitic-dependent familiar dynamics than with a true emotional inability to cope." Tr. 199. Plaintiff acknowledged that he "might" be able to perform a job that did not involve being around people as suggested by Dr. Kralik, but testified that he had not looked for that type of employment. Tr. 44, 195.

Further, the ALJ reviewed the medical evidence in totality, specifically noting the State Disability Determination Services' ("DDS") consulting physicians found Plaintiff was not significantly limited in his ability to understand, remember and carry out short, simple instructions. Tr. 17; *See Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010) (the Commissioner must determine disability based on the totality of the evidence). The ALJ concluded the RFC was supported by: (1) the lack of objective medical evidence provided to support Plaintiff's alleged pain; (2) Plaintiff's own testimony regarding his daily activities which were inconsistent with his alleged pain; (3) Plaintiff's lack of attributing his pain to his inability to work; (4) Dr. Kralik's belief that proper medication could help Plaintiff with his personality disorders and processing speed; and (5) Plaintiff's lack of investment to return to Dr. Kralik for additional mental health treatment. Tr. 18. As such, the ALJ properly adopted an RFC limiting Plaintiff to work in which interpersonal work performed and complexity of tasks are rote with few variables or judgement, supervision is simple, direct and concrete, and where there is no contact the public. Tr. 53; *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995) (credibility determination within the ALJ's province). The VE responded

with light work jobs[16] as he only had those "numbers handy" for the hearing, but he testified there would be significantly more work available without the exertional limits as asked by the ALJ.[17]  Tr. 53-54.

Because Plaintiff failed to establish his pain as severe or that his mental impairments met the established disorder requirements, it was proper for the ALJ to adopt an RFC that did not require any physical accommodations but did accommodate for limited interpersonal contact with direct supervision and, therefore, the unskilled jobs proffered by the VE were proper.  Weighing the evidence in totality, it is within the province of the ALJ to give more weight to the medical evidence than to Plaintiff's GAF score; that is, the ALJ is not required to ask the VE specifically about available jobs considering Plaintiff's GAF solely.  *Jones*, 619 F.3d at 973-74.  As such, the ALJ had sufficient evidence to rely on in making his mental RFC determination.  *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005) (rejecting argument that ALJ failed to fully and fairly develop the record where there was no indication that the ALJ was unable to make RFC assessment).  For these reasons, the undersigned concludes substantial evidence supports the ALJ's determination regarding Plaintiff's mental limitations.

---

[16]  The VE testified that work at the questioned RFC would be available: (1) Bench assembler (DOT 706.684-042) with 300,000 national jobs and 6,300 regional jobs; (2) Laundry worker (DOT 302.685-010) with 280,000 jobs nationally and 2,500 regional jobs; and (3) Eviscerator (DOT 525.687-074) with 44,000 national jobs and 5,000 regional jobs.  Tr. 54.

[17]  In a vocational analysis from DDS dated 8/17/2009, it was found Plaintiff could perform additional work:  (1) Addresser (DOT 209.587-010); (2) Document preparer/Microfilming (DOT 247.587-018); (3) Tube operator (DOT 239.687-014), as these unskilled jobs are performed at the sedentary level of exertion.  and Tr. 147.

**IV.**     **<u>Conclusion</u>:**

Accordingly, having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's decision, therefore, the ALJ's decision is affirmed and Plaintiff's case is dismissed with prejudice.

DATED this 2nd day of July 2012.

/s/ J. Marschewski
HONORABLE JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE